IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| WORLD TRIATHALON CORPORATION, a Florida Corporation, </br></br> Plaintiff, </br></br> vs. </br></br> JOHN DUNBAR; IAN EMBERSON; HENRY FORREST; GORDON HALLER; ARCHIE HAPAI and RALPH YAWATA, individually and collectively d/b/a/ HAWAIIAN IRONMAN TRIATHALON ORGANIZING COMMITTEE, </br></br> Defendants. </br>_____ | CIVIL NO. 05-00351 JMS/KSC </br></br> ORDER ADOPTING THE SPECIAL MASTER'S REPORTS, DATED JANUARY 29, 2008 AND FEBRUARY 5, 2008 |

## ORDER ADOPTING THE SPECIAL MASTER'S REPORTS, DATED JANUARY 29, 2008 AND FEBRUARY 5, 2008

### I. INTRODUCTION

On January 29, 2008, Magistrate Judge Kevin S.C. Chang issued a Special Master's Report Recommending that Plaintiff's Renewed Motion for Attorneys' Fees Be Granted in Part and Denied in Part ("Special Master's

Report").[1]  Specifically, the Special Master's Report recommends that Plaintiff World Triathalon Corporation ("WTC" or "Plaintiff") be awarded its attorneys' fees and costs in the amount of $161,147.05 because (1) Plaintiff is a prevailing party in this trademark infringement action, and (2) Defendants John Dunbar, Archie Hapai, and Hawaiian Ironman Triathalon Organizing Committee ("HITOC") (collectively "Defendants"), deliberately and willfully infringed Plaintiff's Ironman trademarks, making this an exceptional case meriting the award of attorneys' fees pursuant to 15 U.S.C. § 1117(a).  Defendants timely objected to the Special Master's Report, and argue that this is not an "exceptional case" meriting an award of attorneys' fees.  For the following reasons, the court ADOPTS the Special Master's Report.

## II.  BACKGROUND

**A.    Factual Background**

        The court provides the following condensed facts as outlined from its October 18, 2005 Order Granting Plaintiff's Motion for Preliminary Injunction:

---

[1] The Special Master's Report recommended that this court award Plaintiff a total of $161,590.95 in fees and costs, subject to verification of Plaintiff's costs through submission of a subsequent declaration with receipts.  Doc. No. 172.  Because Plaintiff was unable to verify the total amount of its costs, the Special Master amended his Report on February 5, 2008 to recommend that the court award Plaintiff a total of $161,147.05 in fees and costs.  Doc. No. 174.  The court refers to these two Reports collectively as the "Special Master's Report."

The individually-named Defendants were part of HITOC, which started, sponsored, and participated in the original Ironman triathalon in 1978. In 1980, Valerie Silk and her husband Henry Grundman agreed to take over the race and incorporated Hawaiian Triathlon Corporation ("HTC"). Silk and Grundman moved the race from Oahu to Kailua-Kona in 1981 and began to secure federal registrations for the Ironman trademarks as early as November 22, 1983. Plaintiff purchased HTC in 1989.

Over the past twenty-seven years, the race has grown to become a prominent event, and Plaintiff and its licensees sell a wide array of products featuring the Ironman mark. At the time the Complaint in this action was filed, Plaintiff owned thirty-six federal trademark registrations and 118 foreign trademark registrations for marks relating to the Ironman.

In 1989, Dunbar and several other members of the HITOC -- that is, several of the participants in the original Ironman race -- sued HTC and Silk in the First Circuit Court of the State of Hawaii. *Gordon W. Haller, et al. v. Haw. Triathlon Corp., et al.*, Civil No. 89-3623 (Haw. Cir. Ct. 1993) ("*Haller*"). The *Haller* plaintiffs asked, among other things, that the circuit court enter a preliminary injunction to prevent the sale of HTC (run by Silk) to WTC (Plaintiff in the instant case). The *Haller* plaintiffs argued that they owned the Ironman and

3

that any prior assignment of rights to the Ironman should be set aside as fraudulent. In 1992, the *Haller* plaintiffs filed a first amended complaint including further allegations of fraud and unjust enrichment.

In 1993, the circuit court granted summary judgment in favor of the *Haller* defendants. The circuit court determined that the six-year statute of limitations set forth in Hawaii Revised Statutes ("HRS") § 657-1(4) barred the *Haller* plaintiffs' suit; the circuit court concluded that the *Haller* plaintiffs should have known of their claims in 1980 when the race was transferred to Silk and Grundman, making their 1989 suit untimely.[2]

Despite the *Haller* decision, Dunbar organized an Ironman-length triathlon on Maui from 1994 to 1998, sold Ironman trophies through sports catalogs and at the Ironman race itself, registered two trademarks and a service mark for "Ironman Triathlon" with the Hawaii Department of Commerce and Consumer Affairs ("DCCA"), and contacted Plaintiff's licensees, informing those companies that he owns the rights relating to the Ironman.

**B.    Procedural Background**

On May 25, 2005, Plaintiff filed a Complaint, alleging violation of the Lanham Act, violation of HRS Chapter 481A, common law unfair competition,

---

[2] It appears that the *Haller* plaintiffs did not appeal the circuit court's decision.

4

tortious interference with business relations, slander of title, and seeking declaratory relief.[3]

On April 6, 2006, the court granted in part and denied in part Plaintiff's Motion for Partial Summary Judgment ("April 6, 2006 Order"). Specifically, the court granted Plaintiff's Motion for Summary Judgment as to its Lanham Act, HRS chapter 481A, and common law unfair competition claims.[4] Due in large part to *Haller*, the court found that Defendants had set forth no valid defenses, and had known since at least 1993 that they had no ownership rights in the Ironman marks. The court further granted Plaintiff's request for declaratory relief that "WTC has superior and exclusive rights to the Ironman marks and the Defendants have no ownership or other rights in the Ironman marks." *Id.* at 27.

On October 15, 2007, the court approved an Amended Stipulation by the Remaining Parties to Dismiss All Remaining Claims, and on October 30, 2007,

---

[3] The original Complaint was brought against Defendant Dunbar individually and d/b/a/ HITOC. On November 3, 2005, Plaintiff filed a First Amended Complaint, adding Ian Emberson, Henry Forrest, Gordon Haller, Archie Hapai, and Ralph Yawata as Defendants. WTC subsequently settled its claims against Emberson, Forrest, Yawata, and Haller. Consequently, the court's reference to "Defendants" throughout this Order refers collectively to remaining Defendants Dunbar and Hapai, individually and d/b/a HITOC.

[4] The court denied Plaintiff's request for an order requiring the Director of DCCA to cancel Defendants' state registrations.

5

entered a Final Judgment and Permanent Injunction against Defendants.[5] On November 9, 2007, Plaintiff filed a Motion for Attorneys' Fees.[6] On December 3, 2007, Defendants filed a Response, and on December 13, 2007, Plaintiff filed a Reply.[7]

On January 29, 2008, Magistrate Judge Chang submitted his Special Master's Report, finding that (1) this was an exceptional case warranting sanctions, and (2) Plaintiff should be awarded its reasonable attorneys' fees in the

///

///

///

///

///

///

///

---

[5] On November 29, 2007, Defendants filed a notice of appeal.

[6] Plaintiff had previously submitted several motions for attorneys' fees, which were denied as premature and/or failing to comply with the Local Rules. *See* Doc. Nos. 123, 132, & 154.

[7] The Special Master also allowed supplemental briefing to address whether the Lanham Act and non-Lanham Act claims were so intertwined that it is impossible to differentiate between work done on each claim, and whether Plaintiff's block-billing required a reduction in the fee award. Defendants do not object to the Special Master's determination of either of these issues, or the calculation of attorneys' fees in general.

amount of $161,147.05.  Defendants timely objected,[8] and Plaintiff filed a Response on March 5, 2008.

### III.  **STANDARD OF REVIEW**

In acting on a special master's report, the district court must afford an opportunity to be heard and may receive evidence.  Fed. R. Civ. P. 53(f)(1).  The district court may "adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions."  *Id.*  With an irrelevant exception, the district court must decide de novo all objections to findings of fact and/or conclusions of law made or recommended by the special master.  Fed. R. Civ. P. 53(f)(3) & (4); *see also Summers v. Howard Univ.*, 374 F.3d 1188, 1195 n.6 (D.C. Cir. 2004) (noting that Fed. R. Civ. P. 53 was amended in 2003 to provide for de novo review of a special master's fact findings by the district court).

---

[8] On February 10, 2008, Defendants filed a "First Motion for Reconsideration of Report of Special Master that Plaintiff's Renewed Motion for Attorneys' Fees Be Granted in Part and Denied in Part," Doc. No. 175, and on February 11, 2008 filed a "First Amended Motion for Reconsideration."  Doc. No. 177.  On February 12, 2008, the court issued an order stating that the Local Rules do not provide for a motion for reconsideration on a special master's report.  The court further required Defendants to either: (1) withdraw the Motion for Reconsideration; (2) request the court to treat the Motion for Reconsideration as an objection to the Special Master's Report; or (3) request that the court treat the Motion for Reconsideration as an objection to the Special Master's Report and file a supplemental pleading setting forth any additional objections.  Doc. No. 178.  Contrary to this Order, on February 25, 2008, Defendants filed a "Supplement in Opposition to Report of Special Master that Plaintiff's Renewed Motion for Attorneys' Fees Be Granted in Part and Denied in Part."  Doc. No. 180.  The court treats and refers to Defendants' three filings collectively as "Defendants' Objection to the Special Master's Report" or "Defendants' Objection."  Due to the multiple submissions by the parties on this issue, the court cites to each submission by referring to its Docket Number.

## IV. **DISCUSSION**

In a trademark infringement action, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). "Exceptional cases include cases in which the infringement is malicious, fraudulent, deliberate, or willful."[9] *Horphag Research Ltd. v. Pellegrini*, 337 F.3d 1036, 1042 (9th Cir. 2003) (*citing Gracie v. Gracie*, 217 F.3d 1060, 1068 (9th Cir. 2000)); *Watec Co. v. Liu*, 403 F.3d 645, 656 (9th Cir. 2005) ("A trademark case is exceptional where the district court finds that the defendant acted maliciously, fraudulently, deliberately, or willfully." (*citing Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1216 (9th Cir. 2003)).

Based on a review of the entire record, the court finds that the facts presented here show that Defendants deliberately infringed Plaintiff's Ironman marks, warranting an award of attorneys' fees. As an initial matter, Defendants' infringement was not a close case. In granting Plaintiff's Motion for Summary Judgment on its Lanham Act claim, the court found that there was no genuine issue of material fact that Plaintiff owns the Ironman marks, that these marks are

---

[9] Defendants urge the court to use a standard that requires a finding of bad faith. Doc. No. 180, 13. No such finding is required. *Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1218 (9th Cir. 2003), explained that "[t]he issue is not necessarily one of bad faith: willful or deliberate infringement will suffice." As discussed below, the facts establish that Defendants did not merely use Plaintiff's trademark, but rather used Plaintiff's marks with knowledge that they had no rights to them.

incontestible, and that Defendants' actions create a likelihood of confusion. April 6, 2006 Order, 5. Indeed, Defendants used an identical mark and advertised trophies with this mark in the very same publication that Plaintiff used to advertise its events. *Id.* at 17.

Further, the history of the parties shows that Defendants knew that they had no right to use Plaintiff's marks. In 1989, Defendants sued Plaintiff's predecessor in Hawaii circuit court to prevent the sale of HTC to WTC, in part based on the assertion that they owned rights relating to the Ironman. In 1993, the circuit court granted summary judgment in favor of the *Haller* defendants (*i.e.*, Plaintiffs in this action) because the statute of limitations had run -- the *Haller* plaintiffs (*i.e.*, Defendants in this action) should have known of their claims in 1980 when the race was transferred to HTC. In other words, Defendants' legal action seeking rights relating to the Ironman failed. Because of *Haller*, Defendants have known since at least 1993 that they have no ownership rights in the Ironman race or any related trademarks. April 6, 2006 Order, 18. Despite this knowledge, Defendants later (1) organized an Ironman-length triathlon on Maui from 1994 to 1998; (2) sold Ironman trophies through sports catalogs and at the Ironman race itself; (3) registered two trademarks and a service mark for "Ironman

Triathlon" with the Hawaii DCCA; and (4) contacted Plaintiff's licensees, informing those companies that they, not Plaintiff, own the rights to the Ironman.

None of Defendants' arguments persuades the court that Defendants did not deliberately infringe Plaintiff's trademarks. Before the Special Master, Defendants argued that they (1) believed that they owned the Ironman event and mark given their creation of the event, Doc No. 162, 1; (2) believed that the issue of who owned the Ironman mark had not been determined by the *Haller* case, based on an opinion of counsel, *id.* at 6; (3) did not exactly duplicate Plaintiff's trademark, *id.* at 4; and (4) had a factual basis for their defenses. *Id.* at 5. Each of these arguments is either meritless in light of *Haller*, and/or unsubstantiated by facts.

First, Defendants' argument that they acted on a good faith belief that they owned the Ironman event cannot be sustained due to *Haller*. Defendants attempted through *Haller* to establish ownership of the Ironman event, and lost. After *Haller*, Defendants had no basis for believing they had any ownership rights in the Ironman.

Nor have Defendants established any good faith belief of non-infringement on the basis that they relied on an opinion of counsel. The court recognizes that in some instances, a good faith belief of non-infringement can be

shown through the fact that a defendant made adequate disclosure to legal counsel, received that counsel's advice, and acted upon that advice. *See Earthquake Sound Corp.*, 352 F.3d at 1218 (finding that Defendant "did not establish that it took reasonable measures, such as consulting an attorney, to investigate possible infringement liability"); *Cuisinarts, Inc. v. Robot-Coupe Int'l Corp.*, 580 F. Supp. 634, 638 (S.D.N.Y. 1984) ("But if a client seeks qualified counsel's advice in a timely manner, makes adequate disclosure to counsel, receives counsel's opinion and then acts upon it, surely the Chancellor must pause before branding the client as a wilful, deliberate, fraudulent commercial thief . . . ."). Defendants, however, have not come forward with any opinion of counsel concerning the Ironman trademarks. Instead, Defendants point to a letter sent to counsel for the *Haller* defendants stating that "[o]ur legal consultants and researchers in this case have advised us that [the *Haller* decision] . . . does not adjudicate or address the substantive issue of ownership of the Ironman event or any rights therein." Defs.' Resp. to Pl.'s Mot. for Attorneys' Fees, Ex. 1. This letter is not an opinion of counsel addressing Defendants' potential infringement liability, and does not

///

///

///

indicate that Defendants received and relied on such advice.[10] As such, the court does not infer that Defendants acted reasonably from this letter.

The court also rejects Defendants' argument that their infringement was not deliberate because there are differences between Plaintiff's Ironman mark and Defendants' use of the word.[11] The April 6, 2006 Order explains that Defendants were using an identical mark to take commercial advantage of Plaintiff's trademarks:

> WTC's Ironman mark is well-known, and the Defendants are using an identical mark. Dunbar advertised his trophies in the same publications used by WTC to advertise its events, and he chose this mark because he believed he owns the event (*i.e.*, he chose this mark knowing that another entity was using the identical mark). Although the evidence of Hapai's infringement is more limited, there is uncontroverted evidence that Hapai has infringed on the Plaintiff's trademarks by selling or receiving t-shirts with the Ironman logo on them. In short, Dunbar and Hapai are attempting to take commercial advantage of WTC's trademarks.

---

[10] This letter does not identify the attorneys who advised Defendants, or the basis for their opinion that the *Haller* decision did not adjudicate or address ownership of the Ironman and/or related marks. Further, despite this "opinion," the facts of this case show that Defendants knew that Plaintiff had registered and used the Ironman marks, and could not have believed that they were entitled to them.

[11] Defendants compare only one of their uses of the word Ironman ("Maui Ironman") with only one of Plaintiff's logo-marks. Plaintiff owns at least thirty-six federal trademark registrations relating to the Ironman and Defendants' use of the Ironman mark was not limited to the Maui Ironman. Further, Defendants' argument is belied by their own assertion that they "openly admit, even loudly and explicitly assert that they use the IRONMAN and IRONMAN Triathalon marks . . . ." Defs.' Answer, Doc. No. 15, ¶ 35.

April 6, 2006 Order, 17.

The court further rejects Defendants' argument that their defenses to infringement, while ultimately rejected by the court, nonetheless show a good faith belief of non-infringement. In viewing all of the evidence in a light most favorable to them, Defendants failed to raise a genuine issue of material fact in support of any of their defenses. On their senior rights defense (which requires a showing of continuous use), Defendants "utterly failed" to meet their burden and produced evidence of only "sporadic use" of the Ironman mark since 1980. *Id.* at 11-12. In rejecting Defendants' laches argument, the April 6, 2006 Order explained that:

> The Defendants have known, since at least 1993, that they have no ownership rights in the Ironman trademarks. The Defendants knew that the Plaintiff continued to use the trademarks commercially. The Defendants have used the Plaintiff's trademarks only sporadically since 1993: Dunbar advertised trophies for sale in 1983 and 1989; he organized an Ironman-length triathlon in the mid-1990s; and he and Hapai sold some t-shirts in 2003 and 2004. The Plaintiff's decision to forego court action until 2005 was not unreasonable, given that the Defendants often went years at a time without engaging in any infringing activity. . . . When the Defendants increased their level of infringement in 2003 and 2004 -- Dunbar filed two applications to register Ironman Triathlon trademarks with the Hawaii Department of Commerce and Consumer Affairs (DCCA) in December 2003, and Dunbar and Hapai sold t-shirts in 2003 and 2004 -- WTC took legal action.

*Id.* at 18-19. After Defendants stepped up their acts of infringement, Defendants were well in their rights to bring suit.

Beyond the arguments addressed above, Defendants raise several entirely new arguments not raised before the Special Master. Specifically, Defendants argue that: (1) Defendants' use of the generic word "Ironman" and Plaintiff's Ironman mark are incapable of being confused, Doc. No. 177, 3 & 8; Doc. No. 180, 1-11; (2) the court did not fairly address the genericness of "Ironman," Doc. No. 180, 15; (3) Plaintiff's Ironman mark is not incontestible, *id.* at 16-17; (4) Defendants have a defense of fair use, Doc. No. 177, 4-5;[12] and (5) the equities weigh against an award of fees and costs due to Defendants' limited infringement and the fact that Defendants created the sport. *Id.* at 9.

Other than Defendants' last argument on the equities, Defendants' arguments are directed to non-infringement as opposed to the issue presented here -- whether this is an exceptional case warranting attorneys' fees. The court will not, and cannot, revisit the infringement determination. The April 6, 2006 Order granted summary judgment to Plaintiff on its Lanham Act claim, and Defendants have since appealed to the Ninth Circuit. Defendants' filing of a notice of appeal

---

[12] Of these first four arguments, the only argument Defendants previously raised before this court was the incontestibility of Plaintiff's marks.

divested this court of jurisdiction over those aspects involved in the appeal -- *i.e.*, whether Defendants infringed Plaintiff's trademarks. *See Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58-59 (1982) (per curiam) ("The filing of a notice of appeal is an event of jurisdictional significance -- it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."). Accordingly, the court does not have jurisdiction to hear Defendants' arguments on non-infringement.[13]

The court does, however, consider and reject Defendants' argument that as a matter of equity, attorneys' fees are not warranted because Defendants' infringement, if any, was minimal. The court recognizes that an award of attorneys' fees pursuant to 15 U.S.C. § 1117(a) is "'never automatic and may be limited by equitable considerations.'" *Perfumebay.com Inc. v. EBAY, Inc.*, 506

---

[13] Further, to the extent any of these arguments could be construed as arguing that this is not an exceptional case, Defendants did not raise these arguments before the Special Master (or, for the most part, even on summary judgment). Defendants cannot raise entirely new arguments for the first time on an objection to a Special Master's Report. *See Convolve, Inc. v. Compaq Computer Corp.*, 2004 WL 1944834, at *1 (S.D.N.Y. Sept. 1, 2004) ("The new arguments now advanced by Convolve come too late because they could have been raised to the Special Master but were not."); *Nilssen v. Motorola, Inc.*, 2002 WL 206007, at *11 (N.D. Ill. Feb. 8, 2002) ("The proper time for Nilssen to assert arguments and allegations in opposition to Motorola's Motion for Summary Judgment was in his response to Motorola's motion, not during his objections to the findings of the Special Master, long after the motions have been fully briefed and filed."); *see also United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000) ("We conclude that a district court has discretion, but is not required, to consider evidence presented for the first time in a party's objection to a magistrate judge's recommendation."). To hold otherwise would re-open this case to full litigation on the merits -- an impermissible result.

F.3d 1165, 1178 (9th Cir. 2007) (*quoting Rolex Watch, U.S.A., Inc. v. Michel Co.*, 179 F.3d 704, 711 (9th Cir. 1999)). However, the equities do not weigh in favor of Defendants. The mere fact of limited sales and/or use "does not require a finding that the infringement was not willful and deliberate." *Earthquake Sound Corp.*, 352 F.3d at 1218. Further, Defendant's acts were not limited to selling a few trophies and shirts. Rather, Defendants also registered Ironman trademarks with the DCCA and contacted Plaintiff's licensees claiming to be the true owners of the Ironman. No later than 1993, Defendants knew that they had no ownership rights, and had no basis for believing they could use the Ironman marks. Defendants deliberately infringed Plaintiff's trademarks, warranting attorneys' fees.

///

///

///

///

///

///

///

///

## V. **CONCLUSION**

For the reasons stated above, the court ADOPTS the Special Master's Report awarding Plaintiff's attorneys' fees in the amount of $161,147.05.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, March 19, 2008.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*World Triathalon Corp. v. Dunbar et al.*, Civ. No.  05-00351 JMS/KSC; Order Adopting the Special Master's Reports, Dated January 29, 2008 and February 5, 2008